# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3346

_____

| | | |
|---|---|---|
| Missouri Child Care Association, doing business as Missouri Coalition of Children's Agencies, | * * * * | |
| Appellee, | * * * | |
| v. | * * | |
| | * | Appeal from the United States |
| Denise Cross, Director of the Division | * | District Court for the |
| of Family Services of the Missouri | * | Western District of Missouri. |
| Department of Social Services, in her | * | |
| official capacity; Dana K. Martin, | * | |
| Director of the Missouri Department | * | |
| of Social Services, in her official | * | |
| capacity, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  April 15, 2002

Filed: June 28, 2002

_____

Before BOWMAN, RILEY, and MELLOY, Circuit Judges.

_____

BOWMAN, Circuit Judge.

The Missouri Child Care Association (MCCA) brings this 42 U.S.C. § 1983 action against Denise Cross, Director of the Missouri Division of Family Services,

and Dana Martin, Director of the Missouri Department of Social Services (collectively, the Directors). The MCCA seeks declaratory and injunctive relief to enforce the foster-care provider reimbursement provisions of the Adoption Assistance and Child Welfare Act of 1980 (CWA or the Act), 42 U.S.C. §§ 670-679b (1994 & Supp. V 1999), also known as Title IV-E of the Social Security Act. The Directors moved for judgment on the pleadings, asserting that they are entitled to the benefit of the state's Eleventh Amendment immunity, so that the District Court[1] lacks jurisdiction over them. The court denied the motion, and the Directors appeal.[2] We affirm.

I.

Enacted by Congress pursuant to its powers under the Spending Clause,[3] the CWA creates a joint federal-state program that provides federal funds to participating states to pay for certain foster-care and adoption expenses. "The Act provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act." Suter v. Artist M., 503 U.S. 347, 351 (1992). Specifically at issue in this suit, the Act imposes upon participating states the obligation to make "foster care maintenance payments," which reimburse institutional foster-care providers for a variety of expenses incurred caring for abused and neglected children. 42 U.S.C. § 672. These payments are to

---

[1]The Honorable Nanette J. Laughrey, United States District Judge for the Western District of Missouri.

[2]We have jurisdiction over this interlocutory appeal under the collateral-order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47 (1949); Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997).

[3]The Spending Clause grants Congress the power "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

42 U.S.C. § 675(4)(A).

The state of Missouri has availed itself of the funds offered by Congress through the CWA. Although Congress may not require a state to participate in a program created pursuant to the Spending Clause, once a state agrees to take the funds offered through such programs the state is bound to "comply with federally imposed conditions." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). The Act requires Missouri to submit to the Secretary of Health and Human Services (HHS) a state plan for providing foster care and adoption assistance that meets the standards enacted by Congress. 42 U.S.C. § 671. In Missouri, the Department of Social Services, through its Division of Family Services, has been designated to administer the state plan and assure state compliance with the Act. Mo. Rev. Stat. §§ 207.010, 207.060, 660.010 (2000).

The MCCA, a trade association whose members are institutional foster-care providers in Missouri, sued the Directors alleging that they have failed to comply with the reimbursement requirements applicable to institutional providers set forth in 42 U.S.C. § 675(4)(A). The MCCA alleges that "State officials have failed to adopt a cost-based method of reimbursement to the foster care providers," Br. of Appellee at 5, and that in fact they are reimbursing providers "based on the mathematical formula of dividing the state budget for state-wide foster care by the approximate number of days or units of service." Id. at 7. Thus, the MCCA argues,

the state officials reimburse providers in violation of the Act's provisions because their calculations are "based solely on budget constraints and not on any other methodology." Id.

The Directors respond that this suit is effectively a suit against the state and should be dismissed on the ground "of Missouri's immunity from suit in federal court, embodied in the Eleventh Amendment." Br. of Appellants at 5.

> That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this [C]ourt that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

Ex parte New York, 256 U.S. 490, 497 (1921); see also U.S. Const. amend. XI; Alden v. Maine, 527 U.S. 706, 712-13 (1999); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 267-68 (1997); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996); Hans v. Louisiana, 134 U.S. 1, 15 (1890). Ex parte Young, 209 U.S. 123 (1908), carves out an exception to that fundamental rule: state officials may be sued in their official capacities for prospective injunctive relief when the plaintiff alleges that the officials are acting in violation of the Constitution or federal law. Id. at 159-60; see also Green v. Mansour, 474 U.S. 64, 68 (1985). This exception exists to "preserve the constitutional structure established by the Supremacy Clause." Antrican ex rel. Antrican v. Odom, No. 01-1693, 2002 WL 939566, at *3 (4th Cir. May 9, 2002). According to the Directors, Ex parte Young does not apply to this suit for three distinct reasons. We review de novo the District Court's denial of judgment on the pleadings. Randolph v. Rodgers, 253 F.3d 342, 345 (8th Cir. 2001) (reviewing de novo denial of state's motion to

dismiss on basis of Eleventh Amendment immunity).  We reject in turn each of the Directors' arguments.

## II.

The Directors argue that Ex parte Young is unavailable to the MCCA in this suit because the CWA has a detailed remedial scheme that manifests Congress's intent to preclude such suits and thus make federal jurisdiction unavailable.  Relying on the Supreme Court's decision in Seminole Tribe, 517 U.S. at 74-75, the Directors point out that "[w]here Congress has created a detailed remedial scheme for the enforcement against a State of a statutory right, state officials are not subject to enforcement of that right by the federal courts through prospective injunctive relief." Br. of Appellants at 8.[4]  As far as we have been able to discern, the Directors raise this ground for reversal for the first time in this appeal.[5]  The MCCA has not, however, raised any objection to our consideration of this issue.  Although we are not entirely convinced that this argument is properly before us, see Smith v. City of Des Moines, Iowa, 99 F.3d 1466, 1473 (8th Cir. 1996), we will nonetheless address it on the merits.  We conclude that the CWA does not reflect any intent by Congress to limit Ex parte Young actions, and the Directors are not entitled to the state's Eleventh Amendment immunity under this rationale.

---

[4]In their reply brief, the Directors assert that, under Seminole Tribe v. Florida, *any* remedial scheme, limited or comprehensive, forecloses § 1983 actions and thus this suit.  Seminole Tribe simply does not support such an assertion.  See 517 U.S. 44, 73-76 (1996).

[5]The argument neither appears in their memorandum in support of judgment on the pleadings, nor is it addressed in the District Court's decision. In the District Court, the Directors only argued that the CWA is not the "supreme law" of the land, that the Act did not specifically condition receipt of federal funds on a state's consent to an Ex parte Young suit, and that Missouri is the real party in interest.

The Directors compare this case to Seminole Tribe and suggest that the CWA has a remedial scheme that, like the remedial scheme under the Indian Gaming Regulatory Act (IGRA), Pub. L. No. 100-497, § 11(d), 102 Stat. 2467, 2475 (1988) (codified at 25 U.S.C. § 2710(d) (1994)), demonstrates Congress's intent to preclude Ex parte Young actions. We disagree. The plaintiffs in Seminole Tribe brought their Ex parte Young suit against the governor of Florida, seeking injunctive relief to compel negotiation of a tribal gaming compact.[6] The Court refused to apply Ex parte Young, reasoning that it was unavailable because the statute included a "carefully crafted and intricate remedial scheme" that greatly circumscribed the powers of the federal district court in cases arising under the statute's provisions. Seminole Tribe, 517 U.S. at 73-76. The IGRA's remedial scheme prescribes the role of the courts in resolving disputes between the tribes and the states, and severely limits that role. 25 U.S.C. §2710(d)(3) (dispute resolution provision). Specifically, if compact negotiations fail and the parties go to court, the statute provides that, upon a finding that the state failed to negotiate in good faith, the court's only recourse is to issue an order directing the state and the tribe to conclude a compact within sixty days. At that point, if the parties disregard the court's order, the court has no further power to hold the parties in contempt: the statute prescribes that the parties submit their respective versions of the compact to a mediator who then selects a version to become the agreement between the parties. Further disagreements are then referred to the Secretary of the Interior. By limiting the district court's powers in such a fashion, "Congress chose to impose upon the State a liability that is significantly more limited than would be the liability upon the state officer under Ex parte Young" and thus

---

[6]The tribe sued under the Indian Gaming Regulatory Act's provision granting jurisdiction to the district courts over "any cause of action initiated by an Indian Tribe arising from the failure of a State to enter into" compact negotiations or to negotiate in good faith. Indian Gaming Regulatory Act (IGRA), Pub. L. No. 100-497, § 11(d)(6)(B)(i), 102 Stat. 2467, 2477 (1988) (codified at 25 U.S.C. § 2710(d)(6)(B)(i) (1994)).

indicated its intent to foreclose Ex parte Young actions. Seminole Tribe, 517 U.S. at 75-76.

In contrast to the IGRA, the CWA merely provides for oversight and funding restrictions that may be imposed by the Secretary of HHS. The statute requires HHS to develop a rating system to grade state compliance in providing adoption assistance and foster-care services. 42 U.S.C. § 679b. The regulations promulgated under the Act, which the Directors argue comprise the heart of the Act's remedial scheme, provide for an administrative review process that leads to the Secretary's ultimate authority to withhold funds from noncompliant states. See 45 C.F.R. §§ 1355, 1356 (2001). Neither the review process nor the Secretary's ultimate authority to withhold funds limits the powers of the court or the remedies available in a manner comparable to the restrictions imposed by the IGRA. Moreover, administratively created schemes are generally not sufficient to foreclose private actions, such as an action under Ex parte Young or § 1983, because an administrative act is not sufficiently indicative of Congress's true intent to limit the available remedies. See Blessing v. Freestone, 520 U.S. 329, 346 (1997); Krueger v. Lyng, 927 F.2d 1050, 1055 (8th Cir. 1991). Thus, Seminole Tribe does not compel us to bar the MCCA's suit on Eleventh Amendment immunity grounds.

Moreover, we think that the Supreme Court's decision in Blessing, 520 U.S. at 346-48, supports our conclusion that the CWA does not contain a remedial scheme indicative of Congress's intent to foreclose the remedies sought by the MCCA. Blessing discusses whether a statutory remedial scheme is sufficient to foreclose a § 1983 action. Although that discussion on its face might appear to address a different question than the one raised by the Directors, upon closer examination it is persuasively similar. In Blessing the plaintiffs, seeking prospective injunctive relief, sued the directors of a state agency charged with administering a federal spending-

clause program.[7]   Thus, although the opinion in <u>Blessing</u> does not specifically acknowledge it, the case necessarily represents an application of <u>Ex parte Young</u>. The Court employed essentially the same analysis in <u>Blessing</u> as in <u>Seminole Tribe</u> to resolve whether the remedial schemes at issue indicated congressional intent to foreclose judicial remedies.  <u>See</u> <u>Blessing</u>, 520 U.S. at 346 (concluding that a § 1983 action is unavailable only when allowing such an action would be inconsistent with Congress's carefully crafted statutory scheme); <u>Seminole Tribe</u>, 517 U.S. at 74 ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional . . . remedies." (alteration in original) (quoting <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 423 (1988))).  Applying that rationale, the Court held that the power of the Secretary of HHS to oversee state compliance with Title IV-D of the Social Security Act, and to withhold funds from a noncompliant state, did not amount to the type of carefully crafted scheme that is sufficient to demonstrate Congress's intent to foreclose the availability of a § 1983 action.

The remedies available under the CWA, federal oversight and withholding of funds from noncompliant states, are very similar to the remedies addressed by the Court in <u>Blessing</u>—so similar that we think the Court's decision practically compels our conclusion.  We therefore hold that the Directors are not entitled to Eleventh Amendment immunity on this ground.  <u>See also</u> <u>Joseph A. ex rel. Wolfe v. Ingram</u>,

---

[7]<u>Blessing</u> also addresses a section of the Social Security Act.  In order to qualify for certain federal welfare funds, a state must "certify that it will operate a child support enforcement program that conforms with the numerous requirements set forth in Title IV-D of the Social Security Act."  <u>Blessing v. Freestone</u>, 520 U.S. 329, 333 (1997) (citing 42 U.S.C. §§ 651-669b (1994 & Supp. V 1999)).  The plaintiffs in <u>Blessing</u>, mothers eligible to receive child support enforcement services from the state, sought injunctive relief to force the state to achieve "substantial compliance" with Title IV-D's requirements.  <u>Id.</u>

275 F.3d 1253 (10th Cir. 2002) (holding that the CWA does not include a remedial scheme sufficient to preclude an Ex parte Young action); cf. Suter, 503 U.S. at 360 (opining in dicta that the CWA "may not provide a comprehensive enforcement mechanism so as to manifest Congress' intent to foreclose remedies under § 1983").[8]

## III.

The Directors also urge this Court to conclude that Ex parte Young does not apply to the MCCA's suit because the CWA is not part of the supreme law of the land under the Supremacy Clause.[9] This unusual assertion follows, the Directors argue, from two legal conclusions. First, the "legal fiction" of Ex parte Young exists to "give[] life to the Supremacy Clause." Green, 474 U.S. at 68. Second, the Directors assert that programs created pursuant to Congress's Spending Clause powers, such as the program created by the CWA, are merely contracts with the participating states and therefore those statutes are not "supreme law." For this assertion the Directors

---

[8]The Directors are not aided in this argument by the Supreme Court's recent decision in Gonzaga University v. Doe, No. 01-679, 2002 WL 1338070 (U.S. June 20, 2002). In Gonzaga, the Court holds that the Family Educational Rights and Privacy Act (FERPA), which provides for a review board established by the Secretary of Education to hear individual complaints of violations of the statute's provisions, does not create any individual rights in students or parents that are enforceable in private actions under § 1983. That individuals can bring a complaint for violations of FERPA to a review board distinguishes FERPA from the provisions of the CWA, which provides for no such complaint process for institutional care providers. And, because the Court holds that FERPA does not create any private right to enforce, the Court expressly notes that it does not need to decide whether FERPA has a comprehensive remedial scheme designed to preclude judicial remedies. 2002 WL 1338070, at *10 n.8.

[9]The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

rely on a district court opinion from the Eastern District of Michigan. The Sixth Circuit has recently rejected *in toto* the reasoning employed by the district court in so concluding, <u>Westside Mothers v. Haveman</u>, No. 01-1494, 2002 WL 987291 (6th Cir. May 15, 2002), <u>aff'g in part and rev'g in part</u> 133 F. Supp. 2d 549 (E.D. Mich. 2001), and we have found no other decision in which any federal court of appeals has held that legislation enacted pursuant to Congress's Spending Clause powers is not part of the supreme law of the land. <u>See, e.g.</u>, <u>Antrican</u>, 2002 WL 939566, at *7 (rejecting the "novel position" of the district court in <u>Westside Mothers</u> as being "at odds with existing, binding" Supreme Court precedent). We agree with the Sixth Circuit's reasoned rejection of this argument and likewise reject the argument here.

First, while it is true, as the Directors argue, that "State compliance with spending power legislation is dependent upon State agreement to comply," Br. of Appellants at 14, we reject the notion that, in the context of an <u>Ex parte Young</u> suit, a state's agreement to participate in a federal aid program amounts to nothing more under the Constitution than a contract to be interpreted under ordinary contract principles. As the Sixth Circuit explained, the district court in <u>Westside Mothers</u> misinterpreted language from the Supreme Court's opinions in <u>Pennhurst</u> and <u>Blessing</u>. In <u>Pennhurst</u>, the Court used contract law as an analogy to describe the legal relationship between the federal government and participating states created by the Medicaid program. "[L]egislation enacted pursuant to the spending power is <u>much in the nature of</u> a contract: in return for federal funds, the States agree to comply with federally imposed conditions." <u>Pennhurst</u>, 451 U.S. at 17 (emphasis added). In his concurrence in <u>Blessing</u>, Justice Scalia further drew upon the contract analogy employed by the Court in <u>Pennhurst</u>. <u>Blessing</u>, 520 U.S. at 349 (Scalia, J., concurring). As the Sixth Circuit readily recognized, the Court "makes clear that it is using the term 'contract' metaphorically, to illuminate certain aspects of the relationship formed between a State and the federal government in a program such as Medicaid. It does not say that Medicaid is <u>only</u> a contract." <u>Westside Mothers</u>, 2002 WL 987291, at *3; <u>see also</u> <u>Barnes v. Gorman</u>, No. 01-682, 2002 WL 1305773,

-10-

at *4 n.2 (U.S. June 17, 2002) ("We do not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.").   The Directors urge us to apply the same misinterpretation of <u>Pennhurst</u> and <u>Blessing</u>.  The Sixth Circuit refused to make the logical leap that the Directors urge, from describing such programs as "like contracts" to treating such programs "as nothing more than contracts."  Like the Sixth Circuit, we refuse to make that leap, as it is unsupported by the applicable case law.  <u>See</u> <u>Blessing</u>, 520 U.S. at 329 (recognizing viability of § 1983 action brought under <u>Ex parte Young</u> for violation of federal rights created under Spending Clause programs); <u>Wilder v. Va. Hosp. Ass'n</u>, 496 U.S. 498 (1990) (recognizing viability of § 1983 claim for violation of federal right involving federal-state Medicaid program).

Second, in an analogous context, the Supreme Court has specifically held that, under the Supremacy Clause, federal Spending Clause legislation trumps conflicting state statutes or regulations.  <u>See</u> <u>Blum v. Bacon</u>, 457 U.S. 132, 145-46 (1982) (holding the provisions of a New York welfare program that conflicted with federal regulations under the Social Security Act invalid under the Supremacy Clause); <u>Carleson v. Remillard</u>, 406 U.S. 598, 604 (1972) (holding a California regulation that conflicted with the Social Security Act invalid under the Supremacy Clause); <u>Townsend v. Swank</u>, 404 U.S. 282, 285 (1971) (holding an Illinois statute and regulation that conflicted with the Social Security Act invalid under the Supremacy Clause).  This Court has applied these cases to invalidate state regulations under the Supremacy Clause.  <u>Jackson v. Rapps</u>, 947 F.2d 332, 337 (8th Cir. 1991) (invalidating a Missouri regulation under the Supremacy Clause because it conflicted with federal regulations under Title IV-A of the Social Security Act, 42 U.S.C. §§ 601-615 (1988)), <u>cert. denied</u>, 503 U.S. 960 (1992).  These cases stand for the proposition that the Supremacy Clause indeed applies to Spending Clause enactments and makes them supreme when challenged by conflicting state enactments.  We see no reason for our treatment to differ when the action challenged is the state's

implementation of federal requirements. Thus, the MCCA may seek to enforce Title IV-E's requirements in this Ex parte Young action.

IV.

The Directors' final argument that Ex parte Young does not apply to this case also relies heavily on the repudiated reasoning of the district court in Westside Mothers. A state is the real party in interest, the Directors argue, when state officials act within their lawful authority. In other words, the state is the real party in interest when officials are accused of exercising the authority delegated to them in a substandard or improper manner. The Directors argue that they have been sued by the MCCA precisely because they allegedly are administering Missouri's foster-care and adoption-assistance programs incorrectly. Because they are accused of implementing the program incorrectly, rather than of acting beyond their authority under federal law or of acting under state authority that is "void in the face of contrary federal law," Br. of Appellants at 16, the Directors conclude that Missouri is the real party in interest in this litigation.

We view the distinction the Directors seek to draw as something of a red herring. The CWA requires the state to reimburse providers for specified expenses. The Act does not grant Missouri officials any discretion to deny providers these payments: "Each State with a plan approved under this part shall make foster care maintenance payments (as defined in section 675(4) of this title) . . . ." 42 U.S.C. § 672(a). The Directors are responsible for meeting this requirement, and the MCCA claims that the Directors are failing to do so. "[S]ince Ex parte Young, . . . it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state

-12-

law."  Hafer v. Melo, 502 U.S. 21, 30 (1991) (quoting Scheuer v. Rhodes, 416 U.S. 232, 237 (1974)).[10]

Finally, the Directors argue that because Missouri may be required to increase its expenditure of state funds to comply with a judgment in this case, the state is the real party in interest.  But this argument merely states a real-world consequence that the legal fiction created by Ex parte Young renders of no jurisprudential significance. That as a practical matter this suit may result in an order requiring Missouri to change the method it employs to calculate foster-care maintenance payments, and thus going forward to access funds in its treasury, does not remove this suit from the class of suits allowed under Ex parte Young.  See Milliken v. Bradley, 433 U.S. 267, 289 (1977) (reaffirming that Ex parte Young "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury"); Edelman v. Jordan, 415 U.S. 651, 667-68 (1974); Antrican, 2002 WL 939566, at *4.  "[T]he proper focus [of our immunity inquiry] must be directed at whether the injunctive relief sought is prospective or retroactive in nature," and not on "an injunction's impact on the State's treasury."  Antrican, 2002 WL 939566, at *4.  We conclude that the injunctive relief requested by the MCCA is prospective in nature and thus falls within Ex parte Young.  The Directors are not entitled to Eleventh Amendment immunity on this basis.

---

[10]The state of Missouri has volunteered to participate in this program, and has thus agreed to abide by the legal requirements set forth in the CWA.  The state might have chosen not to participate or to run its own foster-care program.  But having chosen to receive federal dollars, it is bound either to run its program in conformity with the CWA or to forego the federal funds.  See Antrican ex rel. Antrican v. Odom, No. 01-1693, 2002 WL 939566, at *8-*9 (4th Cir. May 9, 2002); Gorrie v. Bowen, 809 F.2d 508, 520 (8th Cir. 1987) ("The state voluntarily accepts the conditions imposed [upon states receiving federal funds] by Congress and, once it chooses to do so, the supremacy clause obliges it to comply with federal . . . requirements." (footnote omitted)).

For the foregoing reasons, we affirm the denial of the Directors' motion for judgment on the pleadings and remand to the District Court for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.